Matter of Caplan (2021 NY Slip Op 01125)





Matter of Caplan


2021 NY Slip Op 01125


Decided on February 18, 2021


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: February 18, 2021
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Barbara R. Kapnick,J.P.,
Troy K. Webber
Cynthia S. Kern
Angela M. Mazzarelli
Saliann Scarpulla, JJ.


Motion No. 2020-03510 Case No. 2019-00252 

[*1]In the Matter of Gordon R. Caplan (Admitted as Gordon Rubin Caplan), a Suspended Attorney: Attorney Grievance Committee for the First Judicial Department, Petitioner, Gordon R. Caplan, (OCA Atty. Reg. No. 2467462), Respondent.



Disciplinary proceedings instituted by the Attorney Grievance Committee for the First Judicial Department. Respondent, as Gordon Rubin Caplan, was admitted to the Bar of the State of New York at a Term of the Appellate Division of the Supreme Court for the First Judicial Department on February 3, 1992.




Jorge Dopico, Chief Attorney, Attorney Grievance Committee, New York (Raymond Vallejo, of counsel), for petitioner.
Michael S. Ross, Esq., for respondent.



Per Curiam 


Respondent Gordon R. Caplan was admitted to the practice of law in the State of New York by the First Judicial Department on February 3, 1992, under the name Gordon Rubin Caplan. At all times relevant to this proceeding, respondent maintained an office for the practice of law within the First Department.
On May 21, 2019, respondent was convicted, upon his plea of guilty, in the United States District Court for the District of Massachusetts, of conspiracy to commit mail fraud and honest services mail fraud in violation of 18 USC § 1349 (see 18 USC §§ 1341 and 1346), a felony. On October 3, 2019, respondent was sentenced to one month in prison, one year of supervised release, 250 hours of community service and ordered to pay a fine of $50,000. Respondent's conviction stemmed from his involvement in the widely publicized college admissions bribery and cheating scandal centered on college admissions consultant William 'Rick' Singer who helped parents bribe test administrators and/or coaches so their children had a better chance of getting into prominent schools.
By order entered November 7, 2019, this Court granted the Attorney Grievance Committee's (AGC) motion and determined that respondent's conviction was a "serious crime," immediately suspended him from the practice of law and directed him to show cause before a referee appointed by this Court within 90 days of his release from prison, why a final order of censure, suspension or disbarment should not be made; respondent joined in the motion (Judiciary Law § 90[4] and Rules for Attorney Disciplinary Matters [22 NYCRR] § 1240.12[c][2]).
On July 31, 2020, a Referee conducted a virtual hearing at which respondent testified on his own behalf and presented evidence of good character. In post-hearing submissions the AGC urged a two-year suspension and respondent advocated for a one-year suspension, with both parties suggesting the suspension be made effective retroactive to the date of this Court's interim suspension. In a corrected report dated October 15, 2020, the Referee recommended adopting the AGC's recommendation, namely, a two-year suspension nunc pro tunc to November 7, 2019. The AGC moves to confirm that recommendation and respondent now supports that request.
In 2015, respondent, who is currently 54 years-old, became co-chair of a major law firm until his arrest in March 2019 for his involvement in the college admissions bribery scandal. Respondent's daughter is a nationally ranked junior tennis player who regularly attended a Florida tennis academy. In June 2018, she was a junior in high school and had not yet applied to colleges. A college counselor at the tennis academy introduced respondent to another college counselor, Rick Singer, saying he was very successful in assisting potential college athletes navigate the college admissions process. Singer and respondent subsequently [*2]engaged in approximately 30 telephone conversations which, unbeknownst to respondent, were tape recorded by the FBI, numerous texts and emails, and one meeting.
During their first phone conversation in June 2018, Singer described what he called his "side door" or quid pro quo scheme that he had successfully engaged in with nearly 800 other families. The specific plan he proposed included having Singer's "tutors" take online courses for respondent's daughter to increase her grades as well as manipulate the standardized college admissions testing process; respondent chose only the latter, which had a price tag of $75,000. Singer explained the first step was to get respondent's daughter tested for a learning difference to get more time to take the standardized test, that way she could take the test at a school that Singer "own[ed]" and he could "guarantee her a score" because his "proctor would then answer her questions, and by the end of the day, she would leave, and [the] proctor would make sure she would get[] a score that would be the equivalent to the number that we need to get," "[s]he won't even know that it happened".
In July 2018, respondent and his daughter flew to Los Angeles to meet with a psychologist recommended by Singer to obtain the medical documentation required to take the ACT exam untimed. Once it was approved, in December 2018, respondent and his daughter travelled again to California to the changed testing location so that Singer's associates could proctor her exam, correct her answers to obtain the desired score, and mail the corrected exam to the ACT grading center in Iowa. This resulted in his daughter receiving a score of 32 out of a possible 36 on her corrected exam; a score respondent thought would likely be sufficient for her to get into his alma mater, Cornell University.
Subsequently, when ACT declined to score the test on the ground that permission for untimed testing had been improperly granted, respondent went into "panic mode," personally calling ACT before retaining counsel to pressure the release of the fraudulently obtained score. Respondent acknowledged that this was "yet another opportunity for [him] to withdraw from the scheme instead of pursuing it."
As part of this proceeding, on December 19, 2019, the AGC took respondent's examination under oath (EUO) during which respondent admitted that from the first phone conversation he understood the implications of Singer's proposal — "[a]t that point I knew what he was talking about was cheating .[h]e was proposing cheating on the test." In subsequent phone calls respondent told Singer "It's just, to be honest, I'm not worried about the moral issue here. I'm worried about the, if she's caught doing that, you know, she's finished" and "keep in mind I am a lawyer. So I'm sort of rules oriented." When asked if he realized at the time that he was committing a crime, respondent testified —
"No. To be honest, it never even occurred to me. It should have. I'd like to [*3]think I was a good lawyer. I wasn't this kind of lawyer, but I was a good lawyer. It should have occurred to me. I knew what I was doing was unethical, I knew what I was doing was immoral, I knew what I was doing was wrong 
"So I wasn't trying to excuse it as not a crime because the threshold was really immoral and unethical; that should have been good enough. And it wasn't."
Respondent acknowledged that he had thought about what the "ramifications and consequences would be" if he were "caught" and even researched them. Respondent concluded that the "worst-case scenario was that [his daughter] would be accused of cheating and would not be able to take the ACT again, so she'd have to take the SAT or apply to a school that didn't require standardized testing." He also extensively researched among others, Singer, his colleagues, and Singer's Key Worldwide Foundation, and although various schools had been investigating Singer for years they never reported it.
Respondent was arrested on March 12, 2019, entered into a plea agreement on April 4 (the first U.S. parent to do so) and the next day issued a televised public apology expressing his shame and taking sole responsibility for his conduct, thinking "that [it] was important [] for showing my kids".
The sentencing judge described the two different schemes that Singer had employed:
"[t]he test taking scheme sought to change an aspect of a student's application to make the package more competitive. The recruitment scheme was directed at gaining a specific spot. And I note here that Mr. Caplan has engaged in the one scheme, the test taking scheme, and explicitly rejected the second scheme, the recruitment scheme."
The judge also considered several factors including that respondent was not a repeat player in that he engaged in the scheme on only one occasion, he was an active participant in that he brought his daughter to the test taking facility but did not involve her directly in the conduct, and there were no fraudulent applications submitted to any school. Although she found respondent "among the least culpable of the defendants," the judge did find 
"one factor that does suggest that there is something slightly more that happened in the course of the conduct here, and that was Mr. Caplan pressuring ACT to release the fraudulently obtained scores. It was a moment where he could have backed out of it and chose instead to push ahead, so — that distinction is something I do note."
The sentencing judge rejected the prosecutor's argument that respondent, as a lawyer and the head of a law firm, was a driving factor and that he traded on his position.
Respondent has served his one-month sentence, paid the fines, and completed the 250 hours of community service; his one-year supervised release ended November 22, 2020.
Respondent cooperated with the AGC and has no disciplinary history. He testified how he disgraced his family and his firm, how he betrayed his former partners, colleagues and his [*4]profession, and he acknowledged that he had several chances to reconsider the wrongness of what he was doing. When asked how he reconciled his statement to Singer that he was not concerned about the moral issue of what he was doing with the person who he thought he was, respondent stated —
"it's an anathema to me . It's an enormous disappointment to me that that's where my head was at .It doesn't matter how I got there. It doesn't matter what I was thinking . It was just abhorrent. I always thought I'd be the guy who would hang up on something like this . But when I was tested in this instance, I went for it.
* * *
"This was hubris. It was arrogant. It was about me, not about my child. That took a lot of self-realization. It was deep insecurity, I think. I frankly think a lot of people in my former profession have this notion of having to prove yourself all the time. It overwhelmed me and it destroyed my life. I destroyed my life."
The Referee noted that the record itself showed that respondent's criminal actions were "out of character with his professional life and his desire to make amends." Respondent presented his pre-sentencing memorandum with some 70 letters of support from, among others, family, friends, former colleagues and Greenwich policemen, all of which showed "the breadth and depth of Caplan's extensive pro bono activities, his help to others in need, his millions of dollars in financial contributions and hours of personal service to Fordham Law School and Cornell University and his numerous acts of generosity and kindness throughout his career." Respondent became well known in the legal community, writing articles and presenting at conferences; he was named "Dealmaker of the Year" by American Lawyer in 2018; and he became more involved with Fordham Law School, providing contributions and becoming a member of the Dean's Advisory Planning Council, for which he was recognized in 2016 with a public service award.
At the hearing, the former Chairman of the law firm where he worked testified that, inter alia, he had worked with respondent for nearly 20 years and knew him quite well due to their management positions, and there was "universal respect and affection" for him. He explained that anybody who knows respondent saw his misconduct as "a real aberration, understood by everyone to be an act of zealousness and protectiveness for his daughter. But it doesn't change anybody's views who know him as to his reputation." The founder of Publicolor testified to respondent's extensive financial and hands on involvement with the organization assisting struggling schools and their students in poorer neighborhoods in New York City with advancing their education. This included serving as a Board member for 10 years (5 years as Chairman), until he was charged with the subject crime, painting with the kids, and being a mentor to many of the high school students. Even after he resigned from the Board, respondent continued to mentor students.
Recalling [*5]his one-month incarceration respondent testified that it was "deeply, humbling, extraordinarily eye-opening" "horrific on many levels" and it "changed my life forever. I don't know for better or for worse, but it's definitely changed the way I view life." During his incarceration he conducted continuing education seminars for other inmates on their lives after prison and how to start and run a business and met with them individually to make sure they understood the materials. In prison respondent "was a kind, caring, and humble man deeply contrite about his actions and earnestly seeking forgiveness and redemption" who "never minimized his conduct or attempted to shift the blame to someone else" and "desire[d] to atone by helping others at Loretto [prison]", with several inmates commenting that "his seminar transformed their own post-release plans."
Prior to his misconduct most of his charitable work was "ironically enough" with education; however, following his experience in prison, respondent wanted to work with an organization that helps inmates and their families and so his community service work was with the Aleph Institute based in Los Angeles which provides "social and religious services focused around the needs of prisoners and their families."
Since his immediate suspension and release from prison, respondent has been getting his "own house in order" and has been working on business issues related to companies regarding negotiations and investing or strategy around transactions.
In considering a proper sanction, the Referee noted that, as respondent admitted before the sentencing judge, "[t]his was not a victimless crime. The real victims are the kids and the parents who played by the rules in the college admissions process."
The Referee also considered the importance of "[t]he attorney's attitude toward the obligations and duties implicit in taking the oath of office" and "notice to the profession that certain conduct will not be tolerated" (Matter of Nearing, 16 AD2d 516, 518 [1st Dept 1962]). The Referee found respondent's "deep and genuine" remorse "expressed over and again" —
"from his allocution at his sentencing in Federal court, his [EUO] before the Committee and the hearing, and from observing his forthright demeanor at the hearing, it is clear that Caplan has learned his lesson — painfully and traumatically. It is difficult, if not impossible, to imagine Caplan ever again deliberately crossing the line and acting criminally or unethically."
However, the Referee suggested that the mitigation could not obscure the purpose of the proceedings, "the protection of the public" and imposing a sanction —
"Caplan was at the very top [of] the legal profession in June 2018 when he had his first conversation with Rick Singer. He was co-chair of one of the country's leading law firms, he had a large and extremely remunerative law practice, he was highly respected by all. Despite all that, when faced with a clear ethical choice, he failed [*6]badly. He knew in that first conversation that Singer was proposing "cheating" the college admissions process. But rather than hanging up the phone, Caplan said yes, signing onto an illegal, criminal scheme that brought shame to himself and to his family.
"In making that choice, Caplan completely disregarded his professional and civic duties. Rather, he used his skills as a lawyer and the rewards of his successful law practice to circumvent the rules, not to honor them, to try to protect himself against the consequences of his clearly ethical and criminal conduct, rather than to choose to avoid any such behavior.
"In these circumstances, the balancing test this proceeding requires weighs against a shorter suspension, but not so heavily, given the weight and consequences of the lessons Caplan has learned, as to require disbarment. I recommend that Caplan be suspended for a period of two years, retroactive to the date of the Appellate Division suspension order of November 7, 2019."
The AGC now moves for an order confirming the findings of fact, conclusions of law and recommendation of the Referee to impose a two-year suspension, nunc pro tunc to November 7, 2019 (date of his interim suspension) in this "serious crime" proceeding. Although he urged a one-year suspension before the Referee, respondent has submitted a separate Memorandum of Law in support of the Committee's request for a two-year suspension and provides a detailed presentation of the evidence in mitigation and case precedent. In view of all of the foregoing, and that the purpose of this proceeding is to protect the public as opposed to punishment (Matter of Samuel, 103 AD3d 134, 137 [1st Dept 2013]), the Referee's report including the sanction recommendation is confirmed.
Within weeks of his arrest, respondent pleaded guilty to conspiracy to commit mail fraud and honest services mail fraud (18 USC § 1349 [see 18 USC §§ 1341 and 1346]), a federal felony, for his participation in a scheme which involved two trips to California and extended for eight months until he was arrested. Almost immediately respondent accepted full responsibility for his criminal and unethical wrongdoing and expressed sincere remorse, not only in court and in public, but to essentially anyone he came into contact with. His honesty about his failings, his shame and the devastating consequences his criminal behavior has had on his personal and professional lives was palpable in his testimony before the sentencing judge, before the AGC (in his EUO) and before the Referee. Respondent's years of mentoring people from all walks of life and participation in charitable and pro bono activities was not done for appearances but involved a substantial commitment of his time and effort, not just financial. Indeed, the numerous letters submitted on his behalf describe the positive impact respondent has had on people's lives spanning decades, and not just with family and friends but with acquaintances and even strangers. [*7]Even the Committee acknowledges that his character evidence is "impressive" and that "there is little reason to believe that he will engage in similar criminal conduct."
Nonetheless, it is clear that respondent's focus at the time was not on the immorality and illegality of his actions but on not getting caught, and he continued with the scheme despite numerous opportunities to walk away. Although no case is directly on point, this Court has faced somewhat similar matters where attorneys have engaged in deceptive conduct and/or bribery resulting in discipline ranging from suspension to disbarment (Matter of Davis, 109 AD3d 154 [1st Dept 2013]; Matter of Bertel, 268 AD2d 112 [1st Dept 2000]; Matter of Holtz, 239 AD2d 24 [1st Dept 1998]; Matter of Stone, 230 AD2d 481 [1st Dept 1997]; Matter of Goldberg, 190 AD2d 269 [1st Dept 1993]; Matter of Lefkowitz, 105 AD2d 161 [1st Dept 1984]).
Additionally, in the 1990's there were several misdemeanor commercial bribery/scheme to defraud cases involving attorneys who participated in the "ten percenter" bribery scheme in which they paid insurance adjusters to influence the handling of insurance claims, resulting in sanctions ranging from censure to disbarment (see e.g. Matter of Kreitzer, 281 AD2d 35 [1st Dept 2001], lv denied 97 NY2d 609 [2002]; Matter of Fields, 280 AD2d 104 [1st Dept 2001]; Matter of Rotter, 241 AD2d 81 [1st Dept 1998]; Matter of Ingber, 239 AD2d 58 [1st Dept 1998]).
A two-year suspension retroactive to his 2019 suspension properly balances respondent's criminal conduct with the substantial evidence in mitigation, the protection of the public, maintaining the honor and integrity of the profession and as a deterrence to others from committing similar misconduct (22 NYCRR 1240.8 [b][2]).
Accordingly, we grant the AGC's motion to confirm the Referee's findings of fact, conclusions of law and recommendation, and respondent is suspended from the practice of law in the State of New York for a period of two years, nunc pro tunc to November 7, 2019, and until further order of the Court.
All concur.
It is Ordered that the Attorney Grievance Committee for the First Judicial Department's motion to confirm the Referee's findings of fact, conclusions of law and recommendation is granted, and
It is further Ordered that respondent, Gordon R. Caplan, admitted as Gordon Rubin Caplan, is suspended from the practice of law in the State of New York for a period of two years, nunc pro tunc to November 7, 2019, and continuing until further order of the Court, and
It is further Ordered that during the period of suspension respondent, Gordon R. Caplan, admitted as Gordon Rubin Caplan is commanded to desist and refrain from the practice of law in any form, either as principal or agent, clerk or employee of another; that respondent is forbidden to appear as an attorney or counselor-at-law before any court, judge, justice, board or commission or other public authority; and that respondent is [*8]forbidden to give another an opinion as to the law or its application or advice in relation thereto, and
It is further Ordered that respondent, Gordon R. Caplan, admitted as Gordon Rubin Caplan, is directed to fully comply with the provisions of the Court's rules governing the conduct of disbarred or suspended attorneys (see 22 NYCRR 1240.15), which is made a part hereof, and
It is further Ordered that if the respondent, Gordon R. Caplan, admitted as Gordon Rubin Caplan, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency and the respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 1240.15(f).
Entered: [February 18, 2021]